v. Hester. Mr. Mullen, go ahead. If it may please the Court, Patrick Mullen appearing on behalf of Mr. Hester. This is a matter where a West Point cadet was convicted on two counts of child pornography, one for possession, one for receipt and distribution. We've submitted moving papers before this Court. We have identified eight issues with regard to it, but first and foremost is the issue with regard to the failure of the government to provide impeachment materials as to a critical witness in the case. And that witness was a Special Agent Stephen Cerruti. It was Special Agent Stephen Cerruti that, pursuant to a search warrant, went into this cadet's room, a room he shared with another cadet, a man by the name of Anunu, went in there and found the phone that had the child pornography images on them. And it's that child pornography, I mean, it's the phone that was the critical link between my client and the images that were ultimately found on the phone and also on the computers. We were not advised during the course of the trial that Agent Cerruti, in the matter of Bershasky, which is a case in the Eastern District and then on the Second Circuit, where it was found that he, together with another Special Agent, a man named Robert Robb, engaged in misbehavior with regard to a — Did the misbehavior go to credibility? Absolutely. Absolutely it does, because we — our focus in this investigation, in the trial, was that it was a flawed investigation by the government. And part of what we attacked was the fact that they went after my client versus going after someone else. And it was Cerruti that went into the room, that found the phone in a bag unidentified as to who the bag belonged to. It's Cerruti who claimed that it was under my client's desk, whereas on cross-examination we focused upon the fact that it was a desk that both Hester and Anunu shared. There are other — Are you sure that that was your client's cell phone? No. No. But the problem is, the problem is that the phone, whoever has control of the phone — okay, Your Honor — has control of the phone is in a position where they can download the images onto the phone. It's the control of the phone that's — and the e-mails where distribution took place. So it is the control of the phone that's the issue. And our position is — Are you sure that there were objects on this phone and put there when your client was on sabbatical and away from West Point? There is evidence that there was images — Child pornography on the phone when your client was not at West Point and nowhere near the roommate whom you're saying may have been responsible. There was evidence that there were images and e-mails that took place while my client was not at West Point. But the thing is, there are ways that people could possibly engage in what they call spoofing to do so. Yeah, I know. But now you're getting mighty far out. And certainly your argument on sufficiency of the evidence, which is not the one you're now making, but a jury would be entitled to think if it was at time there, it was also at the other. But doesn't also this go to how significant this, whether it is Giglio or not, Giglio evidence would have been? Well, our position is that Cerruti was a critical witness for the government. That without linking the phone in that room to him. If, for example, it was found — Are you saying that any time an agent has done something wrong or that went wrong in another case, that is something that must be told to anyone else that agent is involved in, regardless of how what went wrong there is relevant to this. And you are now linking it to this thing about the phone. But that's a fairly weak link, I should think, in terms of this case. I respectfully disagree with Your Honor. The answer to your first question depends upon what the agent has done wrong. In Bershansky, it's Agent Cerruti with Agent Rob that misled Magistrate Judge Azraq as to the search involved. And the decision by Judge Matsumoto in Eastern District and by this circuit here makes that clear. He made major mistakes. In addition, there is a case called Bustaniac that's cited in the Second Circuit, where again it's cited that Rob, with his team, had done this before. That's very — But how did those mistakes there impugn what he did here? You know, I can understand how that could be. If somebody in one case lied and here said something, that's directly relevant. If a mistake was of the same sort as this, that's directly relevant. But if there was just a mistake, and I'd like to know how that mistake is relevant to what happened here. But more — it was more than just a mistake. It was misleading the court, and then you get into the question of credibility, and that's fair game. So let me just then focus on what the agent, Cerruti's, testimony actually was about. Beyond just saying I found the cell phone in the bag, what did he say? Well, he testified that he went in to the room, that he conducted a search first on the laptop. Both my clients and Nunu's came up clean. That's helpful. Helpful to your client. All right. Very helpful. So I've got no problem with that. But then in terms of finding a bag situated in the room and going inside the bag, he finds the cell phone. Is there anything else he says beyond that? Was there anything else inculpatory to your client that he said that he testified about beyond that? Inculpatory? No. No. But that's critical, though. I don't want to downplay that. And my first question to you was, was there any dispute that this was your real dispute, that this cell phone, because there was a confession here that came in, that this — these are items that are on my cell phone. It's a cracked cell phone. But it's a — as far as the confession is concerned, it's a very weak confession. There's nothing in writing with regard to my client. There's nothing recorded about it. During the course of the so-called confession, my client asked for an attorney. We have an issue before this court as to whether or not he was in custody. It's an issue that Judge Bracetti grappled with after the hearing was conducted. So I submit to you that the confession by itself is not make or break. And whereas, in terms of this agent, the fact that he found it in an unidentified bag without more is something that I submit to you is something that would be fodder for cross-examination. And we didn't get the information. I mean, I think that has to be noted here. We didn't get that. We didn't get a chance to cross-examine him. That's critical in terms of our opportunity to present it to the jury. Had we had that, this could have been a very, very different verdict, and that's what the case is called for here. You have reserved some time. Thank you. Thank you very much. May it please the Court. My name is Lauren Shore. I'm an assistant U.S. attorney in the Southern District of New York. I represent the United States on this appeal, and I also represented the United States at trial in this case. The defendant, Ricky Patrick Hester, was convicted in a fair trial that was free from error, going directly to the point that Mr. Mullen has raised regarding the Jiglio issue here. As Your Honors have noted, the agent Cerruti's participation in the Bershansky search and in the Bershansky case is not Jiglio material. Were you aware? Was the government aware? Not maybe you personally, but of this material? I was not, Your Honor. The government, forget about it. The government was not aware of this material, Your Honor. We learned of this material upon receiving the appeal in this case. Having reviewed the cases, of course, though, we would submit. . . By government, you mean the prosecution team, right? Correct, Your Honor. It was the government writ large, obviously, did know about it. The prosecution team in this case. Agent Cerruti was not the case agent in the Bershansky matter. He participated in the search. He participated in the investigation and in the search. Agent Robb was the real agent. That's correct, Your Honor. Agent Robb was the case agent. Agent Robb was the affiant on the search warrant that was used to execute the search. Now, the search was a bad search. The Eastern District found that. This Court found that as well. There's no disputing that. But there's nothing in either court's ruling that goes to Agent Cerruti's credibility, Agent Cerruti's character for truthfulness. So we would submit that that is just simply not Jiglio material. Now, even if the Court were to find that it's Jiglio material, which, again, we believe it's not, it is not material to the defendant's case. Agent Cerruti's finding of the cell phone, which was underneath the defendant's desk in a black bag. The phone had a cracked screen, which the defendant described his phone to have a cracked screen. Among other than that, there's ample evidence on the phone that makes abundantly clear that the defendant, Mr. Hester, was the user of this phone. Agent Cerruti's finding of the phone was one small piece of evidence that established for the jury that the defendant was the user of the phone. The contacts in the phone had the defendant's home phone number. It had his stepfather's number. It had his own e-mail accounts, his own Facebook account, his own Dropbox account. The phone number for the phone was the phone number that he himself had registered to him. In addition, the phone accessed the e-mail accounts and the Dropbox accounts that are in question in this case, the Yahoo account and the Dropbox account, both of which were registered to him. So the idea that this piece of evidence was so critical to a particular element of the government's case is just not true. Really, the argument is that even if they had found it under the roommate's desk, it would have really made no difference. Correct, Your Honor. The evidence on the phone linked this defendant to that phone and established that he was the one who used that phone and he was the one who used that phone to engage in the charge conduct here. And as to Your Honor's point, Judge Calabresi, the text messages in the phone, in fact, did establish that that phone was being used when the defendant, Mr. Hester, was not at West Point. There were text messages throughout the phone of his use of the phone while he was at home in Grainger, Indiana. It's hard to imagine that some other person, his roommate, was using the phone  while he was at home. So for those reasons, the government would submit that the evidence of Agent Cerruti's participation in that first case is not Jiglio and is certainly not material to the defendant's case. The defendant also briefly raised the confession here. The government would submit that Judge Borsetti did not abuse his discretion, did not commit any error in finding that the defendant was not in custody at the time and properly admitted it at trial. The defendant confessed while he was at West Point. He was interviewed by two Homeland Security agents. He was told twice that he was under arrest. He was told that he did not speak to the agents. He was cooperative. He was offered water. There was no threat. There was no restraints, nothing of the nature that would overbear his will or suggest that his freedom of restraint, his freedom of action was restrained in any way. Mr. Mullen also made reference to some statements by the defendant that he was denied an attorney, that he was told that he didn't have a right to remain silent. Judge Borsetti did not credit any of those facts that were raised by the defendant in his affidavit, which was submitted at the suppression hearing stage. Judge Borsetti credited the testimony of two agents who participated in the search or, I'm sorry, in the interview, both of whom denied that those statements were ever made. The statements that Judge Borsetti did not credit, how did he make that finding? By explicitly indicating that he didn't credit them or just not commenting on them or adopting findings which foreclosed any other finding? Your Honor, he did a combination of both. Judge Borsetti considered the testimony of two agents, Agent Kelly McManus and Agent Appelbaum, and he also received the affidavit of the defendant. In his ruling on the suppression motion, Judge Borsetti stated he found the testimony of both witnesses to be credible, and he rejected a few of the statements that were made in the defendant's affidavit, stating that the defendant never was denied an attorney and that the defendant was never told about negative consequences associated with his failure to speak to the agents. He didn't address all of the allegations that are raised in the defendant's affidavit, but during the testimony of the agents, they testified to each of those allegations and denied each of them. So it's explicit and implicit. Doesn't it strike you a little bit odd that this defendant said all the things that he said in that thing? Just, here I am, I want to tell you about all my troubles since my youth. I mean, I don't mean to second-guess Judge Borsetti, but I've got to say that just reading it, it's hard for me to believe that somebody in that situation would volunteer quite that way. Did it strike you that way? Your Honor, it is an extensive confession. But I would note that everything that the defendant said during that confession was corroborated by other evidence in the case. For example, the Homeland Security agents didn't know, for example, about his Dropbox account. He was the one who told them about the Dropbox account. They then conducted a search. They obtained a search warrant for a Dropbox account, and exactly what he said proved to be true. But that goes to the reliability, not to whether there was a Miranda. That is correct, Your Honor. Just noting sort of the corroboration of the confession. On the question of whether possession of child pornography is a lesser included offense of receiving and distributing child pornography, is it necessary for us to finally reach that question? That hasn't been determined by this circuit, but is it necessary in this case for us to definitively determine that question? Your Honor, I don't believe that it's necessary to reach that question here. As Your Honor noted, this circuit has said that it finds other circuit rulings on that matter persuasive, but has not reached the issue. Yes, we've done that in summary orders. That's correct, Your Honor. I don't believe it's necessary here because, like in other cases, some of which are summary orders, but in other cases in this circuit in the last several years, in this case there is ample evidence for the jury to have relied on. How many images are we talking about? There were 1,200 from the defendant's cell phone. There were another 100 emails that were admitted as exhibits out of 600 in his account. And then I don't know the number from the Dropbox account, but several more. So over 1,000 images that we're talking about from three different sources. Well, given that you know the defendant's Rule 403 claim regarding the showing of the videos, you didn't have to show the videos. Your Honor, we submit that we did have to show the videos. Well, we were permitted to show the videos. It is an element of both offenses that were charged here, and it's direct. The question is did you have to show the videos? Is that something that was necessary as a matter of proof? As a matter of proof, we believe it is. There was no stipulation here. There was no stipulation agreed upon that the images in fact constituted child pornography or, I should say, contained sexually explicit images of children. There was a stipulation that it was real children under the age of 18. But to prove, for the jury to determine whether or not the images constitute child pornography, which is an element that they have to find, the government put forward evidence, and the evidence of that are the images themselves. Now, we ---- If this were football, wouldn't this be piling on? Your Honor, we submit that we took steps to not pile on. Out of the over 1,000 images, we showed four. There were two videos that were shown for just a few seconds and two images that were shown also for just a few seconds. We were careful to limit the amount of time that the jury would have to view those images and videos. And there are cases that make clear that the government does not have to stipulate to its evidence of an element in the case. And we submit here that we put forward evidence of its direct proof of an element in this case. It is, of course, prejudicial because these images are, but their probative value and the manner in which we limited their ---- the jury's exposure to them, we believe, was reasonable here. On the ---- Just a final question on the polygraph evidence. Shouldn't the district court have held a Daubert hearing? Your Honor, we submit that no Daubert hearing was necessary here. The Court carefully considered the Daubert factors, carefully laid it out in an oral ruling, and the Court considered submission. Well, he applied Daubert, but just didn't have a so-called hearing. He did apply Daubert. He did apply Daubert. And there's cases that say, you know, the Court ---- it's in the Court's discretion to have a hearing. And here, given the case law on polygraph evidence, the information was provided by the defendant regarding the polygraph exam that was conducted here. I don't believe that the government ---- that the Court abused his discretion in not having a hearing. Can I follow up on this polygraph evidence? Because I think I was standing right where you are saying something like, along the lines of what you're saying some time ago. And hasn't the reliability changed? I mean, look, the FBI is using it. The CIA is using it. All these federal agencies are using it. Why is it that that is now still considered unreliable? Well, Your Honor ---- As a matter of introducing it in court. I believe that the reliability of the examination is part ---- well, here in particular. I can't fully speak to the whole scientific community. But in this case in particular, the exam that was conducted does not have the assurances of reliability. The exam that was conducted was done without the government's knowledge. It was done two weeks before trial was about to begin. Government only learned about it after the fact upon receiving a motion to admit polygraph evidence. So to the extent the methods would be reliable, I don't think that that's the case here. There was no way to really examine the integrity of this exam. The government received the answers to two questions, as did the court. And ---- The court was focused on the questions posed by the ---- The court was, Your Honor. Yes. And the government did receive other questions, but didn't see any of the other answers that the defendant had provided. So I think in this particular case, there are very serious questions about the reliability of the examination. I'd like to return a moment to the video. The district court, I believe, did not watch the videos, two videos that were presented. Shouldn't it have done so to determine whether it was more prejudicial than probative? Your Honor, the ---- I mean, it didn't look at it, so we don't really ---- you know, shouldn't a court before making that decision see what the government has provided? Your Honor, that is correct that the court did not review them. However, there were extensive discussions between the court, the government, and Mr. Mullen about which images and videos were going to be shown to the jury. It was raised first in a motion in limine. It was discussed at the final pretrial conference and then again at sidebar during trial. The court was informed by the government that we selected a limited number of images and videos that were representative of what the defendant had in this portfolio of 1,000-plus images and videos. And we made that representation. Mr. Mullen had received all of them and had the opportunity to review all of the images and videos. Or, I'm sorry, didn't receive them but had the opportunity to view them at the government's office and stated, the defense stated, you know, given the government's representations, there are no objections here. The government's representations that these were representative and shown for a very short period of time. Thank you. Mr. Mullen is reserved some time. Thank you. If I could deal with the last question first. The record will reflect that on June 8th of 2015, I raised concerns with the court as to the videos that I had observed after I had an opportunity to review them with the government. The judge on the record stated that the government could do basically whatever they wanted to. They could put hundreds of videos in if they so chose. The court left it wide open as to what they could do so that we were left from a defense standpoint as to working as best we could within the framework of what the court had established. As I put in our papers, even five seconds of some of those videos is enough to turn around a mind here. And I agree. Did you offer to stipulate? How is the government going to prove up the child pornography without showing something? In terms of stipulating that there was child pornography? That it showed X, Y, and Z. Your concern is the graphic nature of the videos themselves, right? That's what I raised. The answer is yes. And that's what I raised with the court at the pretrial level. And the court made it clear to me they could put as many, if you look at the record, as many videos as they wanted to, the June 8, 2015 hearing. So at that point, defense was left in a position, given that ruling from the court, to work as best as we could with the government to minimize the impact of what videos would be shown. Mr. Mullen, one final question. You've raised several very important, strong claims. But I gather that none of your claims involve the reasonableness of the sentence. No. I think Judge Brisetti addressed it clearly at sentencing as to the reasons why, and we certainly don't address that. We just address the various issues that we have brought forth before this court. Thanks very much, Mr. Mullen. Thank you, Your Honor. We'll reserve the decision, and we are adjourned. Thank you.